*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0137p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JACADA (EUROPE), LTD. f/k/a CLIENT/SERVER
TECHNOLOGY (EUROPE), LTD.,

*Plaintiff-Appellant,*

No. 03-2521

*v.*

INTERNATIONAL MARKETING STRATEGIES, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
Nos. 02-00078; 02-00479—Robert Holmes Bell, Chief District Judge.

Argued: November 30, 2004

Decided and Filed: March 18, 2005

Before: BOGGS, Chief Judge; CLAY, Circuit Judge; and WALTER, District Judge.[*]

---

### COUNSEL

**ARGUED:** Daniel D. Quick, DICKINSON, WRIGHT, Bloomfield Hills, Michigan, for Appellant. Douglas L. Callander, KREIS, ENDERLE, CALLANDER & HUDGINS, Kalamazoo, Michigan, for Appellee. **ON BRIEF:** Daniel D. Quick, DICKINSON, WRIGHT, Bloomfield Hills, Michigan, for Appellant. Douglas L. Callander, Stacy M. Stine, KREIS, ENDERLE, CALLANDER & HUDGINS, Kalamazoo, Michigan, for Appellee.

BOGGS, C. J., delivered the opinion of the court, in which WALTER, D. J., joined. CLAY, J. (pp. 12-14), delivered a separate opinion concurring in part and dissenting in part.

---

### OPINION

---

BOGGS, Chief Judge. This case concerns an arbitration award arising from an agreement between a Michigan corporation and a foreign corporation to distribute software overseas. Plaintiff appeals the district court's decision to uphold an arbitration award entered in favor of the Defendant. To resolve Plaintiff's appeal, however, we must first resolve two preliminary questions that present complicated and, within our court at least, novel questions of law. We must first determine the scope of the Convention on

---

[*]The Honorable Donald E. Walter, United States District Judge for the Western District of Louisiana, sitting by designation.

the Recognition and Enforcement of Foreign Arbitral Awards. Because we conclude that this arbitration award falls under the Convention, Plaintiff's case was properly removed to the district court. Our second inquiry is whether the federal or state standard for vacating an arbitration award should apply when the parties' agreement contains both an arbitration clause and a general choice-of-law provision requiring the application of a particular state's law. After deciding that the federal standard applies, we analyze the arbitrators' award under that deferential standard. We ultimately conclude that the arbitrators' decision in favor of Defendant drew its essence from the agreement and did not manifestly disregard the law. In reaching all these conclusions, we agree with the district court and we therefore affirm.

# I

Jacada (Europe), Ltd. ("Jacada") is a software development company incorporated in the United Kingdom that created a software package referred to as Jacada/400. International Marketing Strategies ("IMS") is a marketing firm incorporated in Michigan that offered expertise in attracting possible customers for software such as Jacada's. The two companies signed a Distribution Agreement, under which IMS received the right to market and distribute Jacada/400 throughout Europe, the Middle East, and Africa. Three provisions of this contract are crucial to this appeal. The parties agreed to a general choice-of-law provision stating, in its entirety, "[t]his Agreement will be governed by the laws of the State of Michigan." J.A. 103. The Distribution Agreement also contained an arbitration clause specifying that all disputes under the agreement would be resolved "in Kalamazoo, Michigan, and exclusively by arbitration by the American Arbitration Association in accordance with its commercial arbitration rules." *Ibid.* Finally, the parties agreed to a limited liability provision, which included the following:

> Notwithstanding anything herein to the contrary, the maximum aggregate amount of money damages for which [Jacada] may be liable to IMS under this Agreement, resulting from any cause whatsoever other than for a breach by [Jacada] of any of its representations and warranties under paragraph 5(a), shall be limited to the amounts actually paid by IMS to [Jacada] under this agreement.

During the term of the agreement, both Jacada and IMS attempted to sell the Jacada/400 software package to another British company, JBA. When that company eventually purchased the product, Jacada failed to compensate IMS for its efforts in securing the sale. The parties were unable to resolve the dispute between themselves, and IMS subsequently sought arbitration.

An American Arbitration Association panel conducted a five-day hearing concerning the sale to JBA. Following the hearing, the arbitrators issued an award for IMS consisting of one lump sum of $401,299 to be paid within thirty days and then 50% of JBA's nine remaining quarterly payments to Jacada, each of which was for £208,333.[1] In reaching this decision, the arbitrators expressly disregarded the limited liability provision excerpted above. They did so because they found that the provision "is unreasonable and unconscionable and . . . that it fails of its essential purpose."

Shortly thereafter, Jacada filed an action to vacate the arbitration award in Oakland County Circuit Court in Michigan. On the same day, IMS filed an action to enforce the award in the United States District Court for the Western District of Michigan. Because the state court action was filed first, albeit by only a few hours, the district court stayed the federal action. The state court suit was eventually transferred to Kalamazoo County Circuit Court, where IMS sought removal of the case on the sole ground that the case fell under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ("Convention").

---

[1] The arbitrators decided that the dollar amounts for these payments will be determined according to the exchange rate on the date that Jacada receives a payment from JBA.

With both cases then before it, the federal district court consolidated the two actions, naming the first-filed suit, to vacate the arbitration award, as the lead case. The district court subsequently issued two opinions. In the first, it determined that the arbitration fell under the Convention and that the Federal Arbitration Act ("FAA") therefore provided the correct standard of review. In the second decision, the court applied the FAA's standard of review and upheld the arbitrators' award. Jacada has timely appealed both decisions.

## II

This case arrived before the district court in an unusual procedural posture that required the court to examine whether the dispute was properly before it. Because IMS is a Michigan corporation and Jacada is a British corporation, IMS could have removed the case on the basis of diversity jurisdiction. *See* 28 U.S.C. § 1332. In its notice of removal, however, IMS did not invoke the diversity of the parties; it only asserted the ground that the arbitration award fell under the Convention. Because it is the stated policy of this court that "[a]ll doubts as to the propriety of removal are resolved in favor of remand," *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 493 (6th Cir. 1999), we first resolve whether the Convention applies to the arbitration award before us.[2] Because we have no doubt that the Convention does indeed apply, we need not, and therefore do not, consider the jurisdictional question of whether removal on the basis of diversity jurisdiction would be proper in this case.

To explain the Convention's applicability to the present dispute, we find it helpful to begin with some history from the Convention's drafting. The purpose of both this country's adoption of the Convention and the Convention itself was to encourage the recognition and enforcement of *international* arbitration awards and agreements.[3] *See Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974) (stating purposes of the Convention in light of academic commentary). This left an obvious question: what makes an arbitration award or agreement international or foreign? This question provoked considerable debate during the drafting of the Convention because different countries had different concepts of what made an award foreign. *See Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 931 (2d Cir. 1983) (summarizing the dispute); Albert Jan van den Berg, *When is an Arbitral Award Nondomestic Under the New York Convention of 1958?* 6 Pace L. Rev. 25, 32-38 (1985) (same). Generally, the divergence of opinion was between common law and civil law countries. *See Bergesen*, 710 F.2d at 931; van den Berg, 6 Pace L. Rev. at 32-35. Civil law countries, such as France, favored an approach where "the nationality of an award was determined by the law governing the procedure." *Bergesen*, 710 F.2d at 931; *see also* van den Berg, 6 Pace L. Rev. at 33-35 (quoting excerpts from delegates' remarks at the Convention). Under this approach, an arbitration award between two parties that took place in the United States, but applied Dutch law, would be considered domestic only in the Netherlands and foreign, or non-domestic, everywhere else, including the United States. *See Bergesen*, 710 F.2d at 931. Another group of countries, including the United States and United Kingdom, argued that common law countries would have difficulty applying such a distinction and favored a simple rule under which an award was domestic in the country it was entered and foreign elsewhere. *See ibid.* Applying that rule to the previous example, an arbitration award entered in the United States would be domestic in this country regardless of what substantive laws, Dutch or otherwise, were applied to it.

---

[2]If the Convention applies to this case, IMS properly removed the state court suit. *See* 9 U.S.C. § 205 (authorizing the removal of cases in state court that relate to arbitration agreements or awards falling under the Convention); *see also* 9 U.S.C. § 203 (providing federal question jurisdiction to cases arising under the Convention regardless of the amount in controversy).

[3]Earlier treaties raised significant legal and practical obstacles to the enforcement and recognition of arbitration agreements in international contracts. *See generally* Leonard v. Quigley, *Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 70 Yale L.J. 1049, 1054-55 (1961) (summarizing the existing treaties before the Convention and concluding that "the [preceding] treaties ha[d] eased the path of the defaulting defendant and the partial tribunal.").

The language relevant to this appeal was drafted with this disagreement in mind. Article I(1) of the Convention states:

> This Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal. *It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought.*

Convention, art. I(1), 21 U.S.T. at 2519 (emphasis added). As written, the provision allows both approaches. Countries that preferred the territorial approach, such as the United States and the United Kingdom, are accommodated in the first sentence of Article I(1). The second sentence appeases the civil law countries' concern and leaves the question of defining a domestic award up to the signatory countries. A strictly territorial approach is not barred by the second sentence; a signatory country favoring this approach would need only clarify that an award is considered domestic if rendered in that country.

In the present dispute, the issue is whether the award granted to IMS is governed by the Convention. The award could only fall under Article I(1)'s second sentence as an award "not considered as domestic" to this country.[4] *Ibid.* Therefore, stated more specifically, the issue before this court is the proper standard under federal law for determining whether an award is "not considered as domestic . . . ." *Ibid.* After resolving this issue, we will then determine whether that standard renders the present arbitration award "not domestic." Upon review of the statutory language and relevant sister circuit precedent, we conclude that 9 U.S.C. § 202 provides the definition of non-domestic for purposes of the Convention.

We begin by examining the statutory language. When Congress ratified the Convention in 1970, it also passed implementing legislation, found at 9 U.S.C. §§201-208. Of these provisions, only § 202 could offer a definition for whether an award is non-domestic. *See* 9 U.S.C. §§ 201, 203-208.[5] Section 202 reads,

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. *An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.* For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

9 U.S.C. § 202 (emphasis added). The section's first sentence makes the Convention applicable to all arbitration agreements considered commercial under federal law, subject to the exclusions in the second sentence.

---

[4] No one disputes that the first sentence of the article does not apply to this award. That sentence concerns the situation where a party obtains an arbitration award in one country but seeks enforcement in another. In this case, IMS obtained and sought enforcement of the award in the United States.

[5] Section 201 simply implements the Convention. Section 203 grants federal jurisdiction over all cases falling under the Convention. Section 204 determines the venue in which those cases can be brought. Section 205 allows for removal of all cases under the Convention. Section 206 allows a court hearing a case concerning the Convention to order arbitration. Section 207 gives a party up to three years to seek an enforcement order. Section 208 states that the FAA applies to proceedings brought under the Convention so long as the statute does not conflict with the Convention or the implementing legislation found at §§ 202-207.

Several aspects of § 202 convince us that its second sentence provides the standard for determining whether an award is non-domestic.[6]  As noted previously, § 202 is the only section of the implementing legislation that deals with any restrictions on which arbitral awards fall under the Convention.  *See* 9 U.S.C. §§ 201, 203-08; *see also* n.5, *supra*.  Furthermore, the section implicitly speaks to whether it applies to Article I by referring equally to both arbitration agreements and awards.  *See* 9 U.S.C. § 202.  Because Article I defines what arbitration awards fall under the Convention and § 202 engages in exactly the same inquiry, we can only read the section in light of that article.  The first sentence of § 202, which applies the Convention only to arbitration awards "considered as commercial" by the standard found in the FAA, directly relates to Article I(3) of the Convention, under which a signatory country could limit applicability of the Convention to disputes considered commercial by that country.  *See* Convention, art. I(3), 21 U.S.T. at 2519.  Given that the first sentence of § 202 refers to Article I(3), we believe it is even more sensible to read the second sentence of § 202 as dealing with the issue presented by Article I(1).

Article I(1) states that an arbitration award will fall under the Convention if either the award was made in a country different than the country where enforcement is being sought, or the award  is "not considered as domestic" in the country where enforcement is being sought.  *See* Convention, art. I(1), 21 U.S.T. at 2519.  Given that it is a simple factual inquiry to determine the country in which an arbitration award was made, we can divine no purpose for the second sentence of § 202 other than determining whether an award will be "not considered as domestic" under American law.  In fact, all of the limitations in the second sentence of § 202 speak to the domestic or foreign nature of the award.  The citizenship of the parties, the location of property involved in the dispute, where the agreement was to be performed or enforced, or whether the award contains another reasonable relation with a foreign country, *see* § 202, all impact whether an award is foreign or domestic in nature and have little relevance to any other inquiry.  Therefore, we believe that the text of § 202 indicates that its second sentence is meant to define what constitutes a non-domestic award under the Convention.[7]

Arguing that Congress is well-acquainted with drafting definitions, Jacada contends that § 202 cannot be read to create one.  Instead, Jacada claims the second sentence should be read according to its plain language as applying to a specific, limited instance concerning two American parties and nothing more.  Therefore, on Jacada's reading, the section has no applicability in a case such as this one where one of the parties is a foreign corporation.  For the reasons contained in the previous paragraphs, we disagree with Jacada's narrow reading of the statutory section.  We cannot identify any reason, nor can Jacada direct us to any, why these many factors, all of which bear on the foreign or domestic nature of an award, were included in § 202 if that section was not meant to determine whether something is non-domestic.  Moreover, Jacada's position that the second sentence has no applicability when one party is not a United States citizen places it in the perplexing position of arguing that the foreign identity of one of the parties to the suit actually makes a claim less likely to be governed by the Convention.

Our confidence in our conclusion is buttressed by the fact that each of our sister circuits to examine § 202 has interpreted it as creating a general standard for determining the applicability of the Convention.  None of these courts read the section so literally as to preclude application of the section to situations where

---

[6]Jacada argues that because § 202 did not create a definition of non-domesticity under the Convention, nothing has displaced the common law's standard for determining the foreign or domestic status of an award.  *See Lander Co. v. MMP Invs., Inc.*, 107 F.3d 476, 482 (7th Cir. 1997) ("An arbitration award made in *and* sought to be enforced in the United States is a domestic award according to traditional principles of Anglo-American conflicts of law, under which the law of the place of the award determines whether the award is valid.") (citing *Restatement (Second) of Conflict of Laws* § 220, cmt. c (1971)).  For the reasons that follow, we disagree with Jacada and hold that § 202 is meant to create this definition.  Having thus disposed of Jacada's premise, we have no reason to further address its conclusion.

[7]Our review of the legislative history further confirms our interpretation.  The Senate Foreign Relations Committee stated in its summary of the implementing legislation that "[s]ection 202 defines the agreements or awards that fall under the Convention."  S. Comm. on Foreign Relations, Foreign Arbitral Awards, S. Rep. No. 91-702, at 2 (1970).

only one party is a United States citizen. In *Jain v. de Mere*, the Seventh Circuit stated, "Chapter 2 mandates that any commercial arbitral agreement, unless it is between two United States citizens, involves property located in the United States, and has no reasonable relationship with one or more foreign states, falls under the Convention." 51 F.3d 686, 689 (7th Cir. 1995). Similarly, in *Ledee v. Ceramiche Ragno*, the First Circuit applied the Convention in part because "a party to the agreement [is] not an American citizen, or . . . the commercial relationship ha[s] some reasonable relation with one or more foreign states." 684 F.2d 184, 186-87 (1st Cir. 1982). These two cases craft a general standard out of § 202; neither case limits the section's applicability to the situation of two United States citizens. Appellant correctly notes these cases were actions to compel arbitration, therefore implicating Article II of the Convention instead of Article I. This distinction, however, does not eliminate the cases' analogical support. *See Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1441 (11th Cir. 1998) (joining the First and Seventh Circuits' determination of the scope of § 202). The section, on its plain terms, applies equally to "agreements or awards." *See* 9 U.S.C. § 202. These precedents confirm our reading of § 202 as creating a generally applicable standard for determining whether an award is domestic.

More to the point, all of our sister circuits that have considered this issue agree that § 202 contains the standard by which we determine whether an award is non-domestic under Article I(1) and therefore governed by the Convention. In *Bergesen*, the Second Circuit concluded that "Congress spelled out its definition of the concept of [non-domesticity] in section 202." 710 F.2d at 933. The Second Circuit stated that "awards 'not considered as domestic' denotes awards which are subject to the Convention not because made abroad, but because made within the legal framework of another country, e.g., pronounced in accordance with foreign law or involving parties domiciled or having their principal place of business outside the enforcing jurisdiction." *Id.* at 932. More recently, after concluding that § 202 defined non-domesticity under the Convention, the Eleventh Circuit adopted the test articulated by the Second Circuit. *Indus. Risk Insurers*, 141 F.3d at 1441 ("We read [9 U.S.C. § 202] to define all arbitral awards not 'entirely between citizens of the United States' as 'non-domestic' for purposes of Article I of the Convention."). Though not applying the same test, the Ninth Circuit has reached the same conclusion about § 202's applicability and therefore adopted a similar approach. *See Ministry of Def. of the Islamic Republic of Iran v. Gould Inc.*, 887 F.2d 1357, 1362 (9th Cir. 1989) ("three basic requirements exist for jurisdiction to be conferred upon the district court: the award (1) must arise out of a legal relationship (2) which is commercial in nature and (3) which is not entirely domestic in scope.").

Based on our reading of the statute and supported by these precedents, we conclude that 9 U.S.C. § 202 provides the definition for determining whether an award is "not considered as domestic" under Article I(1) of the Convention. Having so concluded, we have little difficulty determining that this arbitration award qualifies as non-domestic under § 202. As the second sentence of § 202 states, "An agreement or award . . . which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." 9 U.S.C. § 202. In this case, the dispute is not entirely between citizens of the United States in that one of the parties, Jacada, is incorporated in the United Kingdom. The contract envisaged performance exclusively overseas, specifically in Europe, the Middle East, and Africa. In fact, the sale that prompted the present dispute was to JBA, a corporation headquartered in the United Kingdom. The property involved in the case, the Jacada/400 software package, was also in the United Kingdom. The award was therefore non-domestic under 9 U.S.C. § 202, and the Convention applies to this case. Because this dispute falls under the Convention, IMS properly removed the case to federal court, *see* 9 U.S.C. § 205, and the case is now properly before this court.

### III

We now turn to Appellant's claim that the arbitrators' award should be vacated. Because the Convention applies to this dispute, we begin with the remedies it makes available. The Convention provides that an award may not be enforced when "the award . . . has been set aside or suspended by a competent

authority of the country in which, or under the law of which, that award was made." Convention, art. V(1)(e), 21 U.S.T. at 2520. Because this award was made in the United States, we can apply domestic law, found in the FAA, to vacate the award.[8] *See Yusuf Ahmed Algahim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 19-23 (2d Cir. 1997) (collecting cases and academic commentary in reaching the same conclusion). This dispute falls under the FAA because the parties' Distribution Agreement, containing the arbitration clause, is a "contract evidencing a transaction involving commerce."[9] 9 U.S.C. § 2.

Though the award falls under the FAA, we must still decide what standard of vacatur to apply to the award because "the central purpose of the FAA is to ensure that private agreements to arbitrate are enforced according to their terms." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 53 (1995) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)). In this case, IMS and Jacada agreed to arbitrate their dispute. But they also agreed to a general choice-of-law provision stating, in its entirety, "[t]his Agreement will be governed by the laws of the State of Michigan." J.A. 103. In light of this choice-of-law provision, the issue before this court is whether the parties intended to opt out of the FAA's standard for vacatur in favor of Michigan's more thorough standard of review. *See generally Detroit Auto. Inter-Insurance Exch. v. Gavin*, 331 N.W.2d 418, 429-35 & 435 n.11 (Mich. 1982) (determining Michigan standard of review and noting that while the Michigan and federal statutes are similar, Michigan courts apply more thorough review). To resolve this issue, we must interpret the parties' contract and then decide, as a matter of law, whether the choice-of-law provision in that contract is intended to apply Michigan's standard of review for arbitral awards. We review this issue *de novo*. *Ferro Corp. v. Garrison Indus., Inc.*, 142 F.3d 926, 931 (6th Cir. 1998).

Our sister circuits that have considered this question have decided that a *generic* choice-of-law provision does not displace the federal standard for vacating an arbitration award. *See Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 341-43 (5th Cir. 2004) ("we hold that the Agreement's choice-of-law provision does not express the parties' clear intent to depart from the FAA's vacatur standard."); *Roadway Package Sys. v. Kayser*, 257 F.3d 287, 293-300 (3d Cir.) ("we need to establish a default rule, and the one we adopt is that a generic choice-of-law clause, standing alone, is insufficient to support a finding that contracting parties intended to opt out of the FAA's default standards."), *cert. denied*, 534 U.S. 1020 (2001). However, we need not look only to other courts in analyzing the issue because our previous opinion in *Ferro* provides considerable guidance. In that case, we were confronted with the question of whether an agreement including both an arbitration clause and a general choice-of-law clause should be interpreted to require the application of Ohio or federal law to the issue of fraudulent inducement. *Ferro*, 142 F.3d at 931. This question mattered a great deal because Ohio law arguably dictated that a claim of fraudulent inducement cannot be submitted to an arbitrator, whereas the Supreme Court has held that, under the FAA, a claim of fraudulent inducement is ordinarily decided by an arbitrator. *See ibid.* (quoting *Prima Paint Corp. v. Flood & Conklin Mfg.*, 388 U.S. 395, 403 (1967) (deciding issue under the FAA)). Applying *Mastrobuono*, we held that the parties did not intend to displace the federal approach to the issue because the choice-of-law clause was "not an 'unequivocal inclusion' of the Ohio rule . . . ." *Id.* at 937.

[8] In reaching this conclusion, we in no way limit the holding of *M & C Corp. v. Erwin Behr GmbH & Co., KG*, 87 F.3d 844 (6th Cir. 1996). In that case, we held that a party seeking to vacate an arbitral award was limited to raising the exclusive grounds found in Article V of the Convention because the FAA does not apply to cases under the Convention if the FAA is "in conflict" with the Convention or its implementing legislation. *Id.* at 851; *see also* 9 U.S.C. 208. Unlike the award in *M & C Corp.*, which had been made in the United Kingdom, *see id.* at 846, the award in this case was made in the United States, and therefore Article V(1)(e) authorizes this court to consider our domestic law, as it is the law where the award was made. Therefore, the FAA and the Convention do not conflict in this case.

[9] An arbitration award can fall under both the Convention and the FAA. *See Lander Co.*, 107 F.3d at 481 (holding that a dispute is governed by both the Convention and the FAA because "nothing in the Convention or its history, or in the implementing legislation or *its* history, suggests exclusivity [from the FAA] . . . ."); *Bergesen*, 710 F.2d at 934 ("There is no reason to assume that Congress did not intend to provide overlapping coverage between the Convention and the Federal Arbitration Act."). In fact, dual coverage is contemplated by the Convention's implementing legislation. *See* 9 U.S.C. § 208 (the FAA applies to cases under the Convention except where the two are in conflict).

We hesitate, however, to reach the same conclusion automatically in this case because, as Jacada correctly argues, the issue in *Ferro* strongly implicated the long-standing federal policy that "ambiguities as to the scope of the arbitration clause itself [should be] resolved in favor of arbitration." *Volt,* 489 U.S. at 476 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)). Applying Ohio's rule would essentially have placed the dispute in the hands of the courts, not the arbitrator, thereby "effectively abrogat[ing] the arbitration agreement *in toto*." 142 F.3d at 936 (distinguishing *Volt* on this ground). The present issue concerns what standard of vacatur should be applied and thus does not impact the scope of the arbitration clause. The arbitrability of the case is not called into dispute by applying either standard of vacatur. Instead, the amount of deference paid to the arbitrators' decision is at issue; but that is different than the "scope of the arbitration clause itself." *Volt*, 489 U.S. at 476.

However, as the Supreme Court made clear in *Mastrobuono*, when interpreting an agreement covered by the FAA, "due regard" must be given not only to the federal policy favoring arbitrability, but also the federal policy favoring arbitrator discretion. *See* 514 U.S. at 62. Therefore, the Court decided that

> the best way to harmonize the choice-of-law provision with the arbitration provision is to read 'the laws of the State of New York' to encompass substantive principles that New York courts would apply, but not to include *special rules limiting the authority of arbitrators*. Thus the choice-of-law provision covers the rights and duties of the parties, while the arbitration clause covers the arbitration.

*Id.* at 63-64 (emphasis added). This federal policy favoring protection of arbitrator authority is implicated by standards of vacatur. While we hesitate to characterize Michigan's standard for vacatur as a "special rule," applying that standard instead of the more liberal federal standard limits the authority of arbitrators by applying greater judicial scrutiny to their decisions. We must therefore interpret the present agreement giving due regard to this policy.

With this consideration in mind, we return to the agreement before us. The Distribution Agreement contains a generic choice-of-law provision and an equally generic arbitration clause. Faced with similarly generic provisions, *see id.* at 58-59, the Court in *Mastrobuono* focused its attention on the generality of the choice-of-law provision, *see id.* at 59-62 (stating sections of arbitration agreement and analyzing both the choice-of-law and arbitration provisions), *see also Roadway Package Sys.*, 257 F.3d at 293 (summarizing *Mastrobuono*'s reasoning). Just as in *Mastrobuono*, the choice-of-law clause could be read as only specifying what state contract law the parties wished to use. *See Mastrobuono*, 514 U.S. at 59 ("the choice-of-law provision . . . may reasonably be read as merely a substitute for the conflict-of laws analysis that otherwise would determine what law to apply to disputes arising out of a contractual relationship."); *see also Roadway Package Sys.*, 257 F.3d at 293 (discussing the ubiquity of such provisions in commercial agreements and the need for them as a method of resolving horizontal choice-of-law questions). Also, just as in *Mastrobuono*, the parties here entered into an agreement in which, without the choice-of-law provision, the FAA rule would apply. *See Mastrobuono*, 514 U.S. at 59 ("in the absence of contractual intent to the contrary, the FAA would pre-empt the [New York state] rule."). Finally, also as in *Mastrobuono*, the clause does not unequivocally suggest an intent to displace the default federal standard. *See id.* at 62 ("At most, the choice-of-law provision introduces an ambiguity into an arbitration agreement that would otherwise allow punitive damages awards."); *see also Roadway Package Sys.*, 257 F.3d at 294-95 (drawing the same conclusion about the choice-of-law clause in that case based on *Mastrobuono*'s language).

Considering the federal policy in favor of arbitration, and after interpreting the agreement's choice-of-law provision in light of the Supreme Court's reading of a similar agreement in *Mastrobuono*, we reach the same conclusion as our sister circuits. We do not believe that the parties intended to displace the federal standard for vacatur when the only evidence of such intent is a generic choice-of-law provision. The arbitration award is to be reviewed according to the federal standard for vacatur.

## IV

Having determined that the federal standard of vacatur applies, our final inquiry is whether the arbitrators' award should be affirmed. Because the arbitrators drew the essence of their award from the agreement and did not manifestly disregard the law, we affirm the district court's decision to enforce the arbitrators' decision. We review the district court's decision to uphold an arbitration award for clear error on findings of fact and *de novo* on questions of law. *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000). In contrast, our review of an arbitration award itself is strikingly deferential. *See Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 330 F.3d 843, 846 (6th Cir. 2003). Under 9 U.S.C. § 10(a), we can only overturn an award if the arbitrators engaged in misconduct, *see* § 10(a)(1)-(3), or "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made," § 10(a)(4). Because there has been no allegation of misconduct, we focus only on § 10(a)(4). We must enforce an award if "the arbitrator's award draws its essence from the . . . agreement, and is not merely his own brand of industrial justice." *United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 36 (1987) (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)). *See also Nationwide Mut. Ins. Co.*, 330 F.3d at 846 (applying *Misco* to commercial arbitration dispute); *Federated Dep't Stores, Inc. v. J.V.B. Indus., Inc.*, 894 F.2d 862, 866 (6th Cir. 1990) (same). In doing so, we must affirm the arbitration award if the arbitrator was "even arguably construing or applying the contract." *Misco*, 484 U.S. at 38. In addition, we can overturn an arbitration award if it displays "manifest disregard of the law." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995).

After the arbitrators decided that IMS deserved payment from Jacada for its role in securing the sale to JBA, the arbitrators were faced with determining the size of IMS's award. In this case, the parties agreed to a limited liability provision, which stated,

> [n]otwithstanding anything herein to the contrary, the maximum aggregate amount of money damages for which [Jacada] may be liable to IMS under this Agreement, resulting from any cause whatsoever other than for a breach by [Jacada] of any of its representations and warranties under paragraph 5(a), shall be limited to the amounts actually paid by IMS to [Jacada] under this Agreement.

The arbitrators did not apply the provision in determining the amount of IMS's award because they found that the provision "is unreasonable and unconscionable and . . . that it fails of its essential purpose."

We believe the arbitrators' award draws its essence from the agreement. Though the arbitrators disregarded the limited liability provision, deciding not to apply such a provision cannot, in and of itself, mean that an award must be vacated. *See Anderman/Smith Operating Co. v. Tenn. Gas Pipeline Co.*, 918 F.2d 1215, 1219 (5th Cir. 1990) ("The arbitration panel clearly acted within the scope of its authority by reading the contract to avoid a result which would impute to the contract an unconscionable bargain."); *St. Luke's Hosp. v. SMS Computer Sys., Inc.*, Nos. 92-1205, 92-1206, 1993 WL 188457, at *10 (6th Cir. June 1, 1993) (unpublished opinion) ("There is no doubt that an arbitrator, if he so decides, may indeed refuse to enforce such a damage limitation provision on the ground of unconscionability or on other grounds . . . ."). In this case, the arbitrators noted that "the potential effect of the limitation of damages provision is to . . . exclude damages for a large breach of the Agreement while permitting damages for a small breach of contract." J.A. 93. In other words, the effect of the limited liability provision would be to render IMS's distributorship rights under the agreement meaningless. The arbitrators, therefore, disregarded the provision to effectuate a core purpose of the contract, IMS's right to distribute the Jacada/400 software package throughout Europe, the Middle East, and Africa. That right means nothing without an effective remedy. *Cf. Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 147 (1803) ("It is a settled and invariable principle, that every right, when withheld, must have a remedy, and every injury its proper redress.") The arbitrators, then, were certainly "arguably construing . . . the contract." *Misco*, 484 U.S. at 48. They were seeking to give the contract what to them was its intended meaning; and we will not reverse their plausible interpretation.

Still, we must determine whether the arbitrators' decision displays "manifest disregard of law." *Merrill Lynch*, 70 F.3d at 421. This too is a highly deferential standard. To merit reversal, the award "must fly in the face of clearly established legal precedent." *Ibid.* Arbitrators act in manifest disregard if "(1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle." *Nationwide Mut. Ins. Co.*, 330 F.3d at 847 (quoting *Dawahare*, 210 F.3d at 669). Upon review, we cannot say that the arbitrators' conclusions that the limited liability provision was unconscionable or fails of its essential purpose displayed manifest disregard of Michigan law, the substantive contract law to which the parties agreed. *Cf.* part III, *supra*.

The landmark case for unconscionability under Michigan law is *Allen v. Mich. Bell Tel. Co.*, 171 N.W.2d 689 (Mich. Ct. App. 1969). Under that case, a court investigating whether a provision is unconscionable asks two questions: "(1) What is the relative bargaining power of the parties, their relative economic strength, the alternative sources of supply, in a word, what are their options?; (2) Is the challenged term substantively reasonable?" *Id.* at 692. The first question relates to procedural unconscionability; the second substantive. Often courts take a balancing approach to this question, requiring a certain amount of both procedural and substantive unconscionability. *Citizens Ins. Co. v. Proctor & Schwartz*, 802 F. Supp. 133, 144 (W.D. Mich. 1992); *overruled on other grounds by Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236, 242 (6th Cir. 1994). Though there are obviously cases with outcomes adverse to IMS's position, *see, e.g.*, *WXON-TV, Inc. v. A.C. Nielsen Co.*, 740 F. Supp. 1261 (E.D. Mich. 1990), no case eliminates the arbitrators' decision from reasonable debate.

The arbitrators did not disregard clearly established legal precedent in determining that the limited liability provision was substantively unreasonable. The arbitrators recognized that the limited liability provision could potentially exclude damages for large breaches of the agreement.[10] Though Jacada can point to cases in which parties recovered a minuscule percentage of their claimed damages because of limited liability provisions, *see CogniTest Corp. v. Riverside Pub. Co.*, 107 F.3d 493, 497 (7th Cir. 1997) (limiting plaintiff to 0.5% of its claimed damages), it can point to no clear statement of Michigan law that makes the provision in this case *per se* substantively reasonable.

Similarly, there exists no clearly established principle barring a finding of procedural unconscionability. Jacada emphasizes that both it and IMS were commercial entities, but Michigan law does not preclude finding a provision unconscionable in such a circumstance. In fact, the plaintiff in *Allen*, the leading Michigan case on this issue, was an independent insurance agent, who was buying advertising for his business. *See Allen*, 171 N.W.2d at 690. Instead, the essential inquiry under Michigan law is the comparative bargaining power of the two parties. *See id.* at 692. There is little law preventing arbitrators from considering that IMS's smaller size coupled with the unique features of the Jacada/400 software package rendered the bargaining power between the two sides sufficiently unequal as to allow a conclusion of unconscionability.

We similarly conclude that the arbitrators did not manifestly disregard the law in concluding that the limited liability provision failed of its essential purpose. Jacada argues that "failure of its essential purpose" is exclusively a principle derived from the Uniform Commercial Code and therefore has no applicability outside that context. Courts, however, have analyzed whether a contractual provision fails of its essential purpose in cases not governed by the U.C.C. *See WXON-TV*, 740 F. Supp. at 1262, 1266-67 (though noting "that the U.C.C. has no application to [the disputed] contract," still discussing and rejecting claim that the limited liability provision fails of its essential purpose under Michigan law); *Networktwo Communications Group, Inc. v. Spring Valley Mktg. Group & CommunityISP, Inc.*, No. 99-72913, 2003 WL 1119763 at *4 (E.D. Mich. Feb. 13, 2003) (unpublished opinion) (citing *WXON-TV* and analogizing to its reasoning) *aff'd*, 372 F.3d 842 (6th Cir. 2004). These cases also demonstrate that courts are not limited to

---

[10] Under the arbitrators' calculations, IMS was likely to eventually receive roughly 3 million dollars. If the limited liability provision applied, the parties agree that IMS would receive $126,000, or less than five percent of the arbitrators' determination of what it deserved under the agreement.

discussing whether a remedy fails of its essential purpose only because of changed circumstances. In *WXON-TV* and *Networktwo Communications Group*, both courts, employing Michigan law, analyzed and rejected plaintiffs' arguments that limited liability provisions failed of their essential purposes. In neither case did the court limit itself to not having found changed circumstances; in fact, neither opinion mentions whether the circumstances surrounding the parties' relationship changed. Instead, both courts rejected plaintiffs' arguments based on a direct examination of the terms of the disputed contracts. *See WXON-TV*, 740 F. Supp. at 1266-67; *Networktwo Communications Group*, 2003 WL 1119763 at *4. Though the arbitrators in our case reached a different outcome, these cases show that the arbitrators' consideration of the doctrine did not contradict clearly established legal principles. Thus, the arbitrators' award does not display manifest disregard of Michigan's law concerning failure of an essential purpose or unconscionability. Because the award also draws its essence from the agreement, we affirm the arbitrators' award.

## V

For the reasons stated above, we AFFIRM the judgment of the district court.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

CLAY, Circuit Judge, concurring in part and dissenting in part. I fully concur in parts I-III of the Court's opinion; however, I write separately with respect to part IV of the Court's opinion, because I believe that the arbitration award manifestly disregards applicable law. Notwithstanding our narrow standard of review, in my view this is the rare case where the award amounts to the arbitrators' "own notions of industrial justice." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1960); *Beacon Journal Publ'g Co. v. Akron Newspaper Guild*, 114 F.3d 596, 559 (6th Cir. 1997).

The arbitrators voided the limitation of damages clause in the parties' agreement because they found it to be "unreasonable and unconscionable," and further found "that it fails of its essential purpose." (J.A. at 74.) The majority is correct that under Michigan law an arbitrator may refuse to apply a limitation of damages provision for unconscionability, and this Court "may not reject [the arbitrator's] findings simply because it disagrees with them." *United Paperworkers Int'l Union*, 484 U.S. at 38, 108 S. Ct. 364; *cf. Anaconda Co. v. District Lodge No. 27 of the Int'l Ass'n of Machinists and Aerospace Workers*, 693 F.2d 35, 37-8 (6th Cir. 1982) ("'Manifest disregard of the law' means more than a mere error in interpretation or application of the law."). However, the majority limits its review of the arbitration award to a recitation of permissible outcomes under Michigan law, failing to examine whether the arbitrators actually applied the law, and ignoring the fact that "a blatant disregard of the applicable rule of law will not be tolerated." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995). Where "the applicable legal principle is clearly defined and not subject to reasonable debate" and "the arbitrators refused to heed that legal principle," we must set the arbitration award aside as being "'in manifest disregard of the law.'" *Id.* (quoting *Wilko v. Swan*, 346 U.S. 427, 74 S. Ct. 182, 98 L. Ed. 168 (1953)).

Michigan law is guided by "the general principle that individuals are fully competent to enter into any contract which they wish to enter into and may obligate themselves to perform in any manner provided the contract is not in violation of any penal laws or public policy of the state." *Michigan Ass'n of Psychotherapy Clinics v. Blue Cross and Blue Shield of Michigan*, 301 N.W.2d 33, 40 (Mich. Ct. App. 1981). The leading Michigan case regarding unconscionability in a commercial setting, *Allen v. Michigan Bell Telephone Co.*, makes clear that in order to void a limitation of damages clause for unconscionability, there must be a finding of both substantive and procedural unconscionability. 171 N.W.2d 689, 692 (Mich. Ct. App. 1969) ("There are then two inquiries in a case such as this: (1) What is the relative bargaining power of the parties, their relative economic strength, the alternative sources of supply, in a word, what are their options?; (2) Is the challenged term substantively reasonable?"). *Allen* narrowly defines unconscionability as "'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonabl[y] favorable to the other party.'" *Id.* (quoting *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965)).

> Thus, merely because the parties have different options or bargaining power, unequal or wholly out of proportion to each other, does not mean that the agreement of one of the parties to a term of a contract will not be enforced against him; if the term is substantively reasonable it will be enforced. By like token, if the provision is substantively unreasonable, it may not be enforced without regard to the relative bargaining power of the contracting parties.

*Id. Allen* involved a contract between a plaintiff who wanted to advertise in the yellow pages and the phone company that printed the telephone book. The Michigan Court of Appeals found that the limitation of damages clause in the parties' contract was procedurally unconscionable because the parties were not in

positions of equal bargaining power; since the defendant printed the only telephone book in the geographic area, the plaintiff was either forced to accept the contract or forego advertising in the yellow pages. *Id.* at 639-40. The limitation of damages clause was also found to be substantively unconscionable because it *completely* absolved the phone company from any liability in the event of a breach of contract. *Id.* at 640.

*Allen*'s result is atypical, and was later recognized as such by the Michigan Court of Appeals. *See Michigan Ass'n of Psychotherapy Clinics,* 301 N.W.2d at 40 (highlighting that court's "primary concern" in *Allen* "was that plaintiff was contracting with a public utility which, in essence, had a monopoly on the type of advertising sought"); *see also Northwest Acceptance Corp. v. Almont Gravel, Inc.*, 412 N.W.2d 719, 723-24 (Mich. Ct. App. 1987) (emphasizing that a finding of unconscionability requires lack of realistic choice for one party coupled with contract terms that are unreasonably favorable to the other party). "Whether a contractual provision is substantively unreasonable or unconscionable depends on the commercial setting, purpose and effect of the provision." *Id.* at 41. Other courts that have interpreted Michigan law, including this Court, have noted that "unconscionability is rarely found to exist in a commercial setting." *Citizens Ins. Co. of Am. v. Proctor & Schwartz, Inc.*, 802 F. Supp. 133, 143 (W.D. Mich. 1992), *overruled on other grounds by Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236, 242 (6th Cir. 1994); *accord U.S. Fibres v. Proctor & Schwartz, Inc.*, 509 F.2d 1043, 1048 (6th Cir. 1975); *WXON-TV, Inc. v. A.C. Nielsen Co.*, 740 F. Supp. 1261, 1264 (E.D. Mich. 1990).

I recite the applicable Michigan law relating to unconscionability to emphasize that in voiding the limitation of damages provision in the instant case, the arbitrators completely failed to follow that law. The majority claims that "[t]here is little law preventing arbitrators from considering that IMS's smaller size coupled with the unique features of the Jacada/400 software package rendered the bargaining power between the two sides sufficiently unequal as to allow a conclusion of unconscionability." Maj. Op. at 10-11. Whatever merit that statement may have in the abstract, it is clear that the arbitrators made no such findings regarding IMS's size in relation to Jacada's, or the 'unique features' of Jacada/400. The arbitration award contains no inquiry into, and no discussion of, the relative bargaining strength of the parties, nor does the award discuss or recite any evidence indicating that IMS was faced with a lack of meaningful choice in entering into the contract with Jacada. The arbitrators also failed to point to any evidence or testimony indicating that the limitation of damages clause was substantively unreasonable. Rather, the arbitrators rested their entire decision on a hypothetical calculation that the limitation of damages clause would arguably operate to divest IMS of 'reasonable' damages under some circumstances. (J.A. at 74.) The reasoning employed by the arbitrators constitutes the most unsupportable kind of speculation and conjecture, which "fl[ies] in the face of clearly established legal precedent." *Merrill Lynch*, 70 F.3d at 421.

Additionally, although the arbitrators alternatively employed a hypothetical calculation to find that the limitation of damages provision fails of its essential purpose, the arbitrators made no argument that the provision failed of its essential purpose in light of Jacada's actual breach. The arbitrators found that application of the limitation of damages provision here would limit IMS to $125,937.91 in damages, but then the arbitrators went on to discuss the "potential effect" of the limitation of damages provision using completely hypothetical figures. *Id.* This reasoning completely ignores Michigan law, under which failure of essential purpose is a default remedy under the Uniform Commercial Code ("UCC"), and is applied in cases where a limitation of damages clause *actually* fails of its essential purpose. *See* MICH. COMP. LAWS ANN. § 440.2719(b)(2) (2004) ("Where *circumstances cause* an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act.") (emphasis added). The UCC provision

> should be triggered only when the remedy [in the parties' agreement] fails of its essential purpose. That is, when unanticipated circumstances cause the seller to be unable to provide the buyer with the remedy to which the parties agree, that remedy has failed of its essential purpose. It is a different question entirely if the remedy is unreasonable or unconscionable, for in such event it may not fail of its essential purpose although it leaves the buyer

> without an adequate remedy as to some part of the actions required to cure
> the problem.

*Price Bros. Co. v. Charles J. Rogers Constr. Co.*, 304 N.W.2d 584, 586 (Mich. Ct. App. 1981); *see also Severn v. Sperry Corp.*, 538 N.W.2d 50, 54-5 (Mich. Ct. App. 1995) ("[D]efendant did not give any indication of an ability or willingness to discover and fix the problem . . . Under these circumstances, we believe [] there was sufficient evidence to conclude that defendant's limited written warranty failed of its essential purpose."); *Krupp PM Eng'g, Inc. v. Honeywell, Inc.*, 530 N.W.2d 146, 149 (Mich. Ct. App. 1995) ("Moreover, because plaintiff was deprived of its furnace for eighteen months and the furnace was not completely fixed for three years, the warranty failed of its essential purpose."); *Kelynack v. Yamaha Motor Corp., USA*, 394 N.W.2d 17, 20 (Mich. Ct. App. 1986) (warranty provision in sales contract failed of its essential purpose where motorcycle became inoperable within ten weeks of purchase due to defect and dealer failed to repair in a timely manner). In addition, the Michigan Court of Appeals has explicitly stated that because the failure of essential purpose doctrine is grounded in the UCC, it is inapplicable in cases not otherwise governed by the UCC, *i.e.*, in cases where the parties have not contracted for the sale of goods. *See Plymouth Pointe Condo. Ass'n v. Delcor Homes-Plymouth Pointe, Ltd.*, No. 233847, 2003 WL 22439654 at *2 (Mich. Ct. App. Oct. 28, 2003). In non-UCC cases, "there is no need to adopt by analogy a UCC concept in analyzing the limited warranty," because the common law mechanism of unconscionability exists. *Id.*[1]

In the current case, the arbitrators made absolutely no finding that there were unanticipated circumstances which caused the limited remedy bargained for by the parties to be unavailable. Furthermore, the arbitrators ignored the fact that the parties are two businesses that engaged in an arm's length transaction supported by consideration. "The law presumes that business people are fully competent to enter into contracts and obligate themselves to perform in any manner they wish," *WXON-TV*, 740 F. Supp. at 1264, and nothing in the arbitration award suggests that the limitation of damages clause bargained for by the parties failed to operate in exactly the manner contemplated at the time the agreement was entered into. Thus, the conception of the failure of essential purpose doctrine contemplated by the arbitrators' award has no basis whatsoever in Michigan law.

Although I concur in parts I-III of the Court's opinion, I respectfully dissent from part IV. I would vacate the arbitration award's calculation of damages and remand to the arbitrators for further findings in light of clearly established Michigan law.

---

[1] Although *Plymouth Pointe* was decided after the arbitration award in this case was issued, the court relies on Michigan cases that existed at the time the arbitrators rendered their decision.