NORTHWEST ACCEPTANCE CORPORATION v ALMONT
GRAVEL, INC

Docket Nos. 85508, 86582, 87008. Submitted May 5, 1987, at Detroit.
Decided August 17, 1987.

Fred D. Peake, owner of National Asphalt Paving, Inc., leased a
rock crusher and other equipment from Rosario Brabant. Bra-
bant informed Peake that the lease was being "farmed out" to
Northwest Acceptance Corporation. At the conclusion of a
forty-five-minute meeting with Gary Hayward, Peake signed a
new lease. Peake and his wife, Dessalee E. Peake, later signed
new documents containing a payment guarantee. From the
time Peake first got possession of the crusher he had trouble
getting it to work. The machine was finally given to Northwest
and sold for $175,000. At that point, National Asphalt had paid
$196,750.32 in rent and had spent $190,480.18 for repairs and
rebuilding the crusher. Northwest Acceptance brought an ac-
tion in the Macomb Circuit Court against National Asphalt, its
subsidiary Almont Gravel, Inc., and Fred and Dessalee Peake
based on the transactions. The court, John G. Roskopp, J.,
found the leases to be unconscionable at the times of their
execution and that defendants did not receive the machinery
contracted for. The court granted a judgment of no cause of
action with respect to the rock crusher. It also denied plaintiff's
motion for attorney fees and granted defendants' motion for
attorney fees. Plaintiff appealed the judgment and the decision
on each motion separately. The appeals were consolidated by
the Court of Appeals.

The Court of Appeals *held:*

1. The trial court's finding of unconscionability was not
clearly erroneous.

2. The trial court did not err in allowing admission of a

REFERENCES

Am Jur 2d, Contracts § 192.

Am Jur 2d, Evidence §§ 910-913, 936.

Am Jur 2d, Sales §§ 233-239.

Unconscionability, under UCC § 2-302 or § 2-719(3), of disclaimer of
warranties or limitation or exclusion of damages in contract
subject to UCC Article 2 (Sales). 38 ALR4th 25.

Construction and effect of UCC Art 2, dealing with sales. 17 ALR3d
1010.

summary of the repairs made by defendants, since it gave plaintiff an adequate opportunity to examine the underlying documents.

3. The trial court did not err in denying attorney fees to plaintiff and granting attorney fees to defendants.

Affirmed.

1. SALES — CONTRACTS — UNCONSCIONABILITY — UNIFORM COMMERCIAL CODE.

The concept that substantively unreasonable contractual provisions will not be enforced is part of Michigan jurisprudence independently of the Uniform Commercial Code; whether a contractual provision is substantively unreasonable or unconscionable depends on the commercial setting, purpose, and effect of the provision.

2. CONTRACTS — UNCONSCIONABILITY.

In order to hold a contract unenforceable on the basis of unconscionability a court must find both procedural and substantive unconscionability.

3. CONTRACTS — UNCONSCIONABILITY.

One who successfully extracts an agreement to an unreasonable contract term cannot insist on the court's enforcing the term on the ground that it was "freely" entered into, where the other party's choices are limited to acceptance of the terms offered or doing without and doing without is not a realistic alternative, nor can one in the name of freedom of contract be heard to insist on enforcement of an unreasonable contract term against another who on any fair appraisal was not free to accept or reject that term.

4. EVIDENCE — SUMMARIES — RULES OF EVIDENCE.

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation, whereupon originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place, and the court may order that they be produced in court (MRE 1006).

5. TRIAL — ATTORNEY FEES — COURT RULES.

In an action in which there has been both the rejection of a mediation award and a rejection of an offer of judgment, the cost and attorney fee provisions of the rule under which the later rejection occurred control (MCR 2.405[E]).

*Butzel, Keidan, Simon, Myers & Graham* (by *Jack J. Mazzara* and *Mark L. Kowalsky*), for plaintiff.

*Schier, Deneweth & Parfitt, P.C.* (by *Ronald A. Deneweth* and *Richard D. Massuch*), for defendants Almont Gravel, Inc., and National Asphalt Paving, Inc.

*Benjamin T. Hoffiz, Jr., P.C.,* for defendants Fred D. and Dessalee D. Peake.

Before: Beasley, P.J., and Hood and E. E. Borradaile,* JJ.

E. E. Borradaile, J. The primary question in this case involves a finding by the trial judge, as the trier of fact, that unconscionability existed in a commercial equipment lease setting. Based upon this finding the trial court denied relief to the plaintiff financing agent. We affirm.

The facts show that defendant Fred D. Peake, owner of defendant National Asphalt Paving, Inc., had been in the asphalt paving business for some time doing small local jobs. In the winter of 1979-1980, Peake secured a state highway job and decided he needed to crush his own rock to supply the necessary aggregate for the job. He saw an ad in a trade magazine for the rental of a rock crusher in Phoenix, Arizona, and contacted the owner, Rosario Brabant. Peake eventually traveled to Phoenix to discuss the possibility of renting the equipment. He entered into a lease which included the crusher as well as several very large pieces of machinery. Peake made a $9,000 deposit with an understanding that the money spent on any crusher repair would be applied to the rental.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

There was no agreement by the parties for the purchase of the equipment.

The crusher components arrived in Michigan in March of 1980, and the crusher was assembled and put into operation. From that time forward Peake had difficulty getting the crusher to operate due to missing parts as well as items on the crusher needing repairs. At times Peake had to purchase aggregate from other sources to fulfill the road paving contract. In May of 1980, Brabant informed Peake that he was farming out the rental agreement to a friend, Gary Hayward. Subsequently, Hayward, then vice-president and branch manager of the Phoenix Arizona Commercial Equipment Regional Office of plaintiff Northwest Acceptance Corporation, met with Peake. Although Peake claims he was confused, a new lease agreement was filled out. At trial, Peake claimed he had not seen the agreement, which had been prepared by the plaintiff, prior to the meeting. At the conclusion of the forty-five-minute meeting, Peake signed the agreement. Peake asserts that he told Hayward of the problems he was having with the equipment and Hayward promised to contact Brabant to insure prompt repair of the equipment. Peake further asserts that he was not informed that Northwest Acceptance was not a guarantor with respect to performance of the equipment and that the damage formula provided for in the lease agreement was not explained to him. Peake indicated that the first time that a purchase price had been mentioned to him was during the meeting with Hayward. Peake had not indicated an interest in buying the equipment.

At the meeting, Hayward informed Peake that plaintiff Northwest Acceptance had purchased the crusher for $330,000 although neither Hayward nor any employees of Northwest Acceptance had

inventoried, appraised, or seen the equipment. Subsequent to signing the documents, Peake continued to have trouble with the crusher; however, he continued to make payments to Northwest. In the winter of 1982, Brabant returned the jaw of the crusher to Peake, supposedly after it had been properly repaired. Upon installation, the crusher operated for less than one day before breaking down. Peake then decided to call in a Michigan machinery repair company to properly repair the machinery. Peake testified that, through June of 1982, approximately $100,000 had been spent by National Asphalt in equipment repairs. In 1982 Peake advised Hayward that he could no longer make the monthly payments due to the repair costs. In response Peake was told to contact the Northwest Acceptance office in Detroit to renegotiate the deal. An appointment was made and Peake was informed to have his wife present. Peake claimed that he did not read the second documents which were signed and was merely told that he and his wife must sign them. The second documents involved a guarantee as to payment.

In the fall of 1984, the machine was returned to Northwest Acceptance, who sold it for $175,000. At that point, National Asphalt had paid $196,750.32 on the crusher and had paid $190,480.18 for repairs and rebuilding. Northwest Acceptance also had a claim on a certain Massey-Ferguson loader and a Freightliner tractor which were cross-collateralized with the crusher.

The trial judge found that the leases in question were unconscionable at the times of their execution. The trial judge stated in his opinion and order that plaintiff brought prepared legal documents to the forty-five-minute meeting which took place in a restaurant and did not give defendant Peake, who represented National Asphalt, any

opportunity to read, study or consult in regards to the deal. Further, the trial judge concluded that the deal speaks for itself as to the benefits plaintiff was to receive. Peake was required to execute the documents immediately or have the equipment taken from him. In addition, plaintiff Northwest Acceptance claimed to be the owner of old and some new equipment without ever having viewed the same. The trial court further noted that defendants did not receive the machinery contracted for and the equipment forwarded to them was in a poor state of operation. The trial court stated that the second lease was even more favorable to the plaintiff and less favorable to the defendants, in both transactions there was an absence of meaningful choice on the part of the defendants, and the contract terms were unreasonably favorable to plaintiff. The trial court found no cause of action on the lease agreement, but required defendants to pay $7,400 for the Massey-Ferguson loader and $31,000 for the Freightliner tractor. A motion for costs was made subsequent to the trial court's opinion. The trial court, consistent with MCR 2.405(E), awarded the attorney for defendants Almont Gravel and National Asphalt $12,740, and the attorney for the Peakes $4,290, allowing both to collect fees at $65 per hour.

Plaintiff on appeal argues that the trial court improperly relied upon the earlier lease in making its decision and should have disregarded that lease because it merged into the subsequent lease on which the suit was brought. Plaintiff also argues that the trial court did not have facts before it to establish procedural unconscionability and that the trial court made no finding whatsoever that the second lease or any of its terms were substantively unconscionable and thus, the trial court erred as a matter of law by declaring the lease

void and unenforceable. Plaintiff also notes that the second lease was a standard financing lease commonly used and commercially accepted as a method of financing and that the court's decision jeopardizes the viability of standard financing leases which play a significant role in national commerce.

The trial court found that MCL 440.2302; MSA 19.2302 was the proper law to apply, that being the portion of the Uniform Commercial Code dealing with unconscionability. The trial court cited *Reed v Kaydon Engineering Corp,* 38 Mich App 353, 356; 196 NW2d 487 (1972):

> The concept that substantively unreasonable contractual provisions will not be enforced is part of our jurisprudence independently of the Uniform Commercial Code.

The commercial setting, purpose, and effect of the contractual provision determines whether that provision is substantively unreasonable or unconscionable. *Id.*

In the practice commentary by Professor Roy L. Steinheimer, Jr., to MCLA 440.2302, he states:

> Under this section, unconscionability is a question of law for the court to decide. The court should determine the issue of unconscionability as of the time of the making of the contract, not as of the time of suit. Unconscionable contracts can be declared unenforceable either in whole or in part at the discretion of the court. The issue can be raised by either party or by the court on its own motion. The parties can, as a matter of right, introduce evidence relevant to any claim of unconscionability and thus lay grounds for review.

The theory that unconscionable contracts will not be enforced by our courts is not entirely new to Michigan law. In the early case of [*Eames v*

*Eames,* 16 Mich 348 (1868)], a court of equity, exercising its traditional power to refuse extraordinary relief, dismissed a bill for specific performance of a contract for the sale of a patent right which would have given the buyer unconscionable advantage over the seller and his creditors. In [*Briggs v Withey,* 24 Mich 136 (1871)], equity granted affirmative relief against an unconscionable settlement by holding promissory notes invalid as to one-half of the amount of the settlement. For other cases in which the court has given either negative or affirmative equitable relief against unconscionable arrangements, see [*Myer v Hart,* 40 Mich 517 (1879)] (debtor-creditor relationship); [*Kukielka v Ranyak,* 229 Mich 13; 200 NW 964 (1924)] (overtones of fraud and an exchange of mixed realty and personalty); [*Johnston Realty & Investment Co v Grosvenor,* 241 Mich 321; 217 NW 20 (1928)] (exchange of realty); [*In re Detroit Macaroni Co,* 46 F Supp 284 (D Mich, 1942)] (bankruptcy situation).

In *Johnson v Mobil Oil Corp,* 415 F Supp 264 (ED Mich, 1976), Federal District Judge Feikens relied on *Allen v Michigan Bell Telephone Co,* 18 Mich App 632; 171 NW2d 689 (1969), lv den 383 Mich 804 (1970), in dealing with the issue of unconscionability. Judge Feikens found unconscionability, noting that other courts have also found unconscionability in a variety of commercial settings, referring to *Fairfield Lease Corp v Umberto,* 7 UCC Rep Ser 1181 (NY Civ, 1970).

In Anno: *"Unconscionability" as ground for refusing enforcement of contract for sale of goods or agreement collateral thereto,* 18 ALR3d 1305, 1307, the author notes that courts have seldom explicitly defined the term "unconscionability" or "unconscionable contract" but frequently use the vague definition found in the early English case of *Earl of Chesterfield v Janssen,* 2 Ves Sen 125, 155;

28 Eng Rep 82 (1750), quoted in *Hume v United States,* 132 US 406, 411; 10 S Ct 134; 33 L Ed 393 (1889), in which it is said that an unconscionable bargain is one "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." The annotation contains a number of cases where, in both a lease and purchase setting, unconscionability has been found. Many of the cases reported involve an uninformed person not involved in commerce dealing with a commercial entrepreneur who is shown to have overreached. It is noted that with the advent of the Uniform Commercial Code the doctrine has gained greater acceptance and the law is still in a state of development.

As noted above, plaintiff has raised a question as to whether both substantive and procedural unconscionability was shown sufficient to justify the trial court's findings. This Court has suggested that in order for a finding of unconscionability to be made both substantive and procedural unconscionability must be present. In *Allen, supra,* pp 637-638, this Court refused to enforce a contract clause which limited the telephone company's liability for damages when it failed to publish plaintiff's advertisement in the yellow pages as it had contracted to do, stating:

> There are then two inquiries in a case such as this: (1) What is the relative bargaining power of the parties, their relative economic strength, the alternative sources of supply, in a word, what are their options?; (2) Is the challenged term substantively reasonable?
> "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable

to the other party." [*Williams v Walker-Thomas Furniture Co*, 121 US App DC 315, 319; 350 F2d 445, 449; 18 ALR3d 1297 (1965)].

Thus, merely because the parties have different options or bargaining power, unequal or wholly out of proportion to each other, does not mean that the agreement of one of the parties to a term of a contract will not be enforced against him; if the term is substantively reasonable it will be enforced. By like token, if the provision is substantively unreasonable, it may not be enforced without regard to the relative bargaining power of the contracting parties.

The trial court in this case found that the leases were unconscionable at the time of their execution. The trial court did not find that the plaintiff had conducted any active or deliberate fraud or misrepresentation upon the defendant, but the elements were not necessary where the deceptive influence was in fact effective and unconscionable. The trial court further noted that there was an absence of meaningful choice on the part of the defendant and the contract terms were unreasonably favorable to the plaintiff.

Though plaintiff has argued that the trial court should not have considered the first lease as noted above, the trial court found that the two leases were interrelated. This Court also believes that the two leases must be analyzed as a single transaction. The circumstances relating to the execution of the first lease cannot be divorced from the circumstances surrounding the execution of the second lease. The trial court specifically found that the defendant was not given any opportunity to read, study, or consult in regards to the deal both as to the first lease and as to the second lease. As defendant Peake testified, he was at a point where he had to have the equipment to continue per-

forming the road work under the contract and felt that he had a "gun to his head."

With respect to procedural unconscionability and any resulting substantively unreasonable terms, this Court in *Allen, supra,* p 637, stated:

> Implicit in the principle of freedom of contract is the concept that at the time of contracting each party has a realistic alternative to acceptance of the terms offered. Where goods and services can only be obtained from one source (or general sources on noncompetitive terms) the choices of one who desires to purchase are limited to acceptance of the terms offered or doing without. Depending on the nature of the goods or services and the purchaser's needs, doing without may or may not be a realistic alternative. Where it is not, one who successfully exacts agreement to an unreasonable term cannot insist on the court's enforcing it on the ground that it was 'freely' entered into, when it was not. He cannot in the name of freedom of contract be heard to insist on enforcement of an unreasonable contract term against one who on any fair appraisal was not free to accept or reject that term.

While this is admittedly a close case, this Court may not set aside the findings of fact by a trial court unless they are clearly erroneous. A finding of fact by a trial court is clearly erroneous when the reviewing court, after reviewing the entire record, is left with a definite and firm conviction that a mistake has been committed. *Precopio v Detroit,* 415 Mich 457; 330 NW2d 802 (1982).

We are satisfied from a review of the evidence presented that the trial court could find that defendants were not faced with a realistic alternative to acceptance of the terms of the first and second lease agreements. Therefore, the trial court did not err in finding procedural unconscionability.

The trial court also found substantive unconscionability by finding that there was an absence of meaningful choice on the part of the defendants and that the contract terms were unreasonably favorable to the plaintiff. One area where unconscionability could be found related to the disclaimer provision in both leases prepared by plaintiff particularly in view of the necessity of defendants' spending $100,000 in extensive repairs in order to make the equipment operational. In view of the provision in the leases that there was an option to purchase, we believe that MCL 440.2302; MSA 19.2302 applies and that the trial court did not err in finding both procedural and substantive unconscionability.

Plaintiff raises other questions relating to the trial court's findings, one involving the admission of a summary of repairs by defendants without granting plaintiff an opportunity to review the underlying documents or conduct a hearing on the accuracy of the summary. MRE 1006 provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

Upon defendants' tender of the summary the court, in order to keep the trial going, admitted the summary and allowed plaintiff to review, during lunch or overnight, the limited number of documents that were made available in court. The trial court told the plaintiff that it had a right to review the originals and that the court would require the original documents to be produced if

plaintiff so desired. Subsequent to the cross-examination of John Robson, a CPA and officer of defendant National Asphalt, plaintiff renewed its objection to the summary of repairs. Plaintiff requested an opportunity to review the originals prior to final judgment by the court, if the individual items listed in the summary were pertinent to the court's final decision and the trial court agreed.

On appeal, plaintiff argues that the trial court relied heavily on the summary of repairs in its findings concerning repair costs. Plaintiff says that the amount of repairs allegedly made to the stone crusher became a substantive issue in the trial and the trial court did not allow plaintiff an opportunity to review the documents and conduct full cross-examination regarding the summary before the court took the case under advisement. Defendant National Asphalt argues that, even if the summary was erroneously admitted, the error was harmless since there was sufficient additional testimony from which the trial court could make its determination that defendant National Asphalt had expended substantial amounts of money in repairing the equipment. Defendants further argue that a reading of the trial court's opinion indicates that the exact amount of the repairs was not essential to the trial court's decision. The fact that a substantial amount had to be spent to repair the machinery was merely the basis for a part of the court's decision. MRE 1006, as noted above, makes the requirement discretionary as opposed to mandatory. In this instance, the trial court gave plaintiff an adequate opportunity to examine the underlying documents. While we do not find error on the part of the trial court, we do believe that any possible error would be harmless.

Plaintiff lastly argues that the trial court erred in refusing to award plaintiff attorney fees and

costs in enforcing its rights under the contracts relating to the Massey-Ferguson and Freightliner agreements. Plaintiff further objects to the trial court's awarding defendants attorney fees and costs. We find that under MCR 2.625 the plaintiff was not the prevailing party as required by the rule in granting fees and costs. We further find that the trial judge was correct in determining that costs and attorney fees should be assessed on the basis of MCR 2.403(O) rather than on an offer of judgment made by defendants. The record indicates that the plaintiff rejected the mediation award of $175,000 which was in settlement of all claims against all defendants. MCR 2.405(E) states:

> In an action in which there has been both the rejection of a mediation award pursuant to MCR 2.403 and a rejection of an offer under this rule, the cost provisions of the rule under which the later rejection occurred control.

Clearly, the mediation came after the offer of judgment and the trial court properly ruled relative to attorney fees and costs under the mediation provisions.

Affirmed.