# STATE OF MICHIGAN

# COURT OF APPEALS

ANN L. SILVERMAN,

        Plaintiff/Counter Defendant-
        Appellee/Cross-Appellant,

v

ALEXANDER R. SPITZER,

        Defendant/Counter Plaintiff-
        Appellant/Cross-Appellee.

UNPUBLISHED
December 16, 2014

No. 317682
Chippewa Circuit Court
LC No. 12-012390-DM

Before: M. J. KELLY, P.J., and CAVANAGH and METER, JJ.

PER CURIAM.

In this suit for divorce, defendant Alexander R. Spitzer appeals by right the trial court's order denying his motion to set aside the settlement agreement and the court's decision to enter the consent judgment of divorce. On cross-appeal, Silverman argues the trial court erred when it denied her motion for sanctions against Spitzer for filing a frivolous motion to set aside the parties' settlement agreement. Because we conclude there were no errors warranting relief, we affirm.

## I. BASIC FACTS

Silverman married Spitzer in January 1980. Silverman and Spitzer are medical doctors and earn substantial incomes as part of their practices; Silverman is a gastroenterologist and Spitzer is a neurologist. Over the course of their marriage, Silverman and Spitzer had four children. They lived in West Bloomfield, but later moved to Sault St. Marie. They owned real property in West Bloomfield, Ann Arbor, Sault St. Marie, and on Mackinac Island.

In September 2012, Silverman sued Spitzer for a divorce. At the time of the divorce, Silverman and Spitzer had only one child who was still a minor, and she was nearly 17 years of age. As such, the primary issues in the divorce were the division of the marital estate and whether the court should order spousal support.

Spitzer counter-sued for divorce in October 2012. In his counter complaint, Spitzer asked the trial court to order Silverman to pay spousal support. Spitzer retained Jay Abramson, who he later stated was his longtime counsellor, to assist him with his divorce. However,

Abramson worked out of West Bloomfield, Michigan, so Spitzer also retained a lawyer who worked in Sault St. Marie, Michael Winnick.

Spitzer moved for temporary spousal support in that same month. In his motion, he alleged that Silverman earned approximately $650,000 per year and that he earned only $250,000 per year. He asked the trial court to order Silverman to pay him $3,875 per week in order to equalize their incomes.

Spitzer is, by his own account, an avid pilot and he and his wife owned a small airplane through a limited liability company. In October 2012, Spitzer incurred what he described as a "propeller strike" while landing the plane at Sault St. Marie. After the incident, Silverman's lawyer, Leanne Deuman, aggressively pursued discovery about the incident—including details about the damage to the plane and the costs to repair it.

In December 2012, Spitzer moved to limit the scope of discovery concerning the airplane. In the motion, which was signed by Winnick, Spitzer maintained that Silverman was attempting to obtain information about the incident for an improper purpose. Specifically, he argued that Silverman intended to use the information to pressure him to drop his request for alimony or risk a report to the Federal Aviation Administration (FAA) or National Transportation Safety Board that might result in the loss of his pilot's license. Accordingly, Spitzer asked the court to limit the scope of discovery to information relevant to valuing the airplane and the extent of any expenditure of marital assets to repair it.

In January 2013, Spitzer filed a motion that was signed by Abramson in which he asked the trial court to declare Silverman to be in default on the basis of allegedly criminal conduct. Spitzer stated that Silverman's lawyer, Deuman, sent his lawyer, Winnick, two letters in which she threatened to report the incident with the airplane to the FAA unless Spitzer immediately provided her with certain information and turned over some marital property with substantial value. Spitzer maintained that the threats amounted to felonies, including racketeering. On the basis of this "criminal misconduct", Spitzer asked the trial court to exercise its equitable powers to dismiss Silverman's complaint for divorce and hold her in default on Spitzer's counter complaint. Spitzer—again acting through Abramson—also asked for leave to amend his complaint to include allegations that Silverman engaged in extortion and racketeering. Evidence would later show that Winnick refused to participate in the drafting or filing of these motions.

In Silverman's response, Deuman stated that her client might have a duty as an owner of the plane to report the accident to the FAA and, because Spitzer refused to disclose the details of the accident, she could not determine whether she had to do so. It was for that reason that she threatened to file a report unless Spitzer turned over the relevant information. She further claimed that Spitzer's lawyer, Winnick, misrepresented the severity of the incident, which appeared to involve $140,000 in repairs. Because the motion to dismiss was not well-grounded in fact or law, Deuman asked the trial court to deny the motion and determine that it was frivolous. She asked the trial court to sanction both Spitzer and Abramson for filing the motion.

In January 2013, the trial court denied Spitzer's motion for leave to amend with prejudice. In separate orders, it also denied Spitzer's motion to limit discovery and to dismiss Silverman's complaint and enter a default. Winnick continued to represent Spitzer along with Abramson.

In February 2013, Silverman moved to have Abramson recuse himself from the case. She argued that he must recuse himself because he had represented both Silverman and Spitzer in the past and had a conflict of interest. In response, Abramson asked the trial court to deny the motion. He characterized Silverman's motion as an effort to interfere with Spitzer's right to be represented by counsel of his choice. He attached a copy of his response to a request for investigation, which he intended to file with the Attorney Grievance Commission after he returned from a trip overseas. A hearing was scheduled for the motion later that same month.

Silverman moved to adjourn the hearing on Spitzer's motion for interim spousal support. In her motion, Silverman alleged that Spitzer recently negotiated a check for $250,000 to repair the airplane and stated that she needed time to conduct further discovery before she could adequately respond to Spitzer's claimed need for spousal support.

On the day of the hearing to consider—along with other matters—whether Abramson should be compelled to recuse himself, Spitzer entered into a settlement agreement with Silverman. Winnick represented Spitzer at the time because Abramson was overseas.

In the settlement, Spitzer and Silverman agreed that Silverman would get her jewelry and retirement benefits, one home in Sault St. Marie and the condominium in Ann Arbor. The parties agreed that Spitzer would get one of the homes in Sault St. Marie, the properties on Mackinac Island, and the home in West Bloomfield. He also received all the membership interests in the limited liability company that owned the parties' airplane. They would each also retain any retirement or pension benefits that either held in his or her own name, as well as their personal property and vehicles. Finally, they agreed that neither party would be awarded spousal support and provided that spousal support would "be forever barred." The parties signed the agreement and dated it February 21, 2013.

Before accepting the settlement, the trial court heard testimony from Silverman and Spitzer concerning the consent judgment. Both Silverman and Spitzer testified that they entered into the agreement after consulting with their lawyers and both agreed that it was in their best interest to settle. Spitzer also agreed that he voluntarily, intelligently, and knowingly entered into the agreement on the basis of his understanding of the options open to him.

In March 2013, Silverman moved for entry of a judgment of divorce incorporating the settlement agreement.

In that same month, Lea Ann Sterling and Steven Paciorka substituted for Winnick as Spitzer's lawyers along with Abramson. Spitzer then moved—through his new lawyers—to have the settlement agreement set aside. Spitzer argued that the settlement was invalid because he was coerced or operating under duress when he entered into the settlement. He also maintained that the agreement must be set aside because it was unconscionable. Specifically, Spitzer relied on his allegation that Silverman makes substantially more than him and received

approximately $2.4 million of the marital estate, while he received only around $1.6 million in assets.

Spitzer attached copies of his email and written correspondence with Winnick in support of his motion to set aside the settlement. The correspondence revealed that Winnick frequently addressed Spitzer with strong—even unprofessional—language and tones. In particular, Winnick warned Spitzer that it was his belief that Spitzer might have engaged in misconduct when he used a power of attorney from his father to transfer funds from his father's accounts and used his father's trust to pay for repairs to the airplane. Winnick wrote that the transfers might expose Spitzer to civil or criminal liability and opined that his conduct compromised the viability of his claims in the divorce. Winnick stated that he would continue to treat Spitzer as "at risk for criminal indictment" until he reduced the transactions to writing and ensured that they were transparent and proper. Winnick also vigorously urged Spitzer to settle the divorce in order to avoid what he characterized as the risk of criminal investigation that might leave Spitzer without a license to practice medicine.

In response to the motion to set aside, Silverman argued that the record showed that Spitzer was not coerced or operating under duress when he agreed to the settlement. Silverman stated that her lawyer's letters concerning the airplane incident were sent months prior to the settlement and could not have operated to coerce Spitzer into settling. Because she and her lawyer did not otherwise participate in any acts to coerce Spitzer, the settlement must be enforced. Silverman also argued that duress did not apply because there was no evidence that Spitzer did not have the mental capacity to understand and enter into the settlement agreement. She further maintained that there is no basis for setting the agreement aside as unconscionable; even though the agreement did not provide for an equal distribution of the marital assets, the division was not so inequitable as to shock the conscience. Finally, Silverman asked the court to sanction Spitzer and his lawyer for filing a frivolous motion to set aside the settlement agreement.

In April 2013, Silverman formally requested sanctions under MCR 2.114. She asked the trial court to award her costs and attorney fees for defending against a frivolous motion to set aside the settlement agreement.

The trial court heard arguments and took testimony concerning the events surrounding Spitzer's decision to enter into the settlement agreement in March, April, and June 2013. On August 6, 2013, the trial court heard closing arguments and announced its decision.

The court stated that Spitzer did not contend "that he was prevented from understanding . . . the nature and effect of the agreement because of fraud, mutual mistake or severe distress." Rather, he claimed the settlement was the result of "duress or coercion." The trial court found that Spitzer was not coerced into entering into the agreement by Deuman's previous threats to report the landing incident to the FAA because Spitzer knew that the landing incident did not need to be reported and would not result in any sanctions. The court stated that the "landing mishap" was not "even a consideration" when Spitzer negotiated the settlement.

-4-

The court similarly rejected the contention that Winnick coerced Spitzer into settling by stating that Spitzer's handling of his father's money was suspect. If there is a dispute over the handling of those funds, that dispute would be between Spitzer and the trust and had nothing to do with the decision to settle.

Finally, the trial court rejected Spitzer's contention that the settlement agreement was unconscionable. The court recognized that Spitzer may have received less than half the marital estate, but it determined that the division was not itself unconscionable. The trial court denied the motion to set aside the settlement and indicated that it would sign the judgment of divorce.

On August 6, 2013, the trial court entered a judgment of divorce, which incorporated the parties' settlement agreement. On the same day, the trial court entered an order denying Spitzer's motion to set aside the settlement.

These appeals followed.

## II. MOTION TO SET ASIDE

## A. STANDARDS OF REVIEW

Spitzer argues on appeal that the trial court erred when it denied his motion to set aside the settlement agreement. He maintains that the trial court misunderstood the law applicable to a claim that a party's consent was induced by coercion and improperly excluded relevant evidence. Considering the totality of the evidence, Spitzer states, the trial court should have found that he was coerced into settling. This Court reviews a trial court's decision to set aside a settlement agreement for an abuse of discretion. See *Groulx v Carlson*, 176 Mich App 484, 493; 440 NW2d 644 (1989); *Tinkle v Tinkle*, 106 Mich App 423, 426; 308 NW2d 241 (1981) (declining to disturb the trial court's finding that the petitioner knowingly and voluntarily entered into the settlement agreement and, accordingly, concluding that the trial court did not abuse its discretion when it denied the petition to set aside the agreement). "The question as to what constitutes duress is a matter of law, but whether duress exists in a particular case is a question of fact." *Lafayette Dramatic Productions, Inc v Ferentz*, 305 Mich 193, 216; 9 NW2d 57 (1943). This Court reviews the factual findings underlying a trial court's decision for clear error. *Vittiglio v Vittiglio*, 297 Mich App 391, 398; 824 NW2d 591 (2012). Finally, this Court reviews a trial court's evidentiary decisions for an abuse of discretion. *Barnett v Hidalgo*, 478 Mich 151, 158-159; 732 NW2d 472 (2007).

## B. ANALYSIS

Generally, trial courts must uphold the validity of settlement agreements reached through negotiations and agreement by the parties to a divorce action. *Kline v Kline*, 92 Mich App 62, 71; 284 NW2d 488 (1979). However, as with any contractual agreement, the parties must validly consent to the settlement before it will bind them. *Vittiglio*, 297 Mich App at 400. Accordingly, a trial court may set aside a settlement agreement that was the result of fraud, duress, or mutual mistake, or where one of the parties lacked the mental capacity to enter into the agreement as a result of severe distress. *Van Wagoner v Van Wagoner*, 131 Mich App 204, 209-214; 346 NW2d 77 (1983).

-5-

As the trial court aptly noted, Spitzer did not argue that the settlement agreement had to be set aside because he lacked the mental capacity to understand it or because it was the result of fraud or mistake. Instead, Spitzer argued that the settlement agreement had to be set aside because Silverman's lawyer, along with Winnick, forced him to enter into it. Specifically, he maintained that he was so overwhelmed by Winnick's threats of civil and criminal liability and Deuman's threats to report him to the FAA that his decision to enter into the settlement agreement cannot be said to be voluntary—he only acted out of fear that he would lose his pilot's license and perhaps his medical license.

Our Supreme Court has recognized that duress or coercion may warrant setting aside an agreement. *Lafeyette Dramatic Prod*, 305 Mich at 216. Duress involves a compulsion or constraint by which a person is illegally forced to do or forebear some act by a threat that would cause a person of ordinary firmness to fear serious injury to person or reputation. *Id.* In order to establish duress, the party seeking to set aside the agreement must show that the party applying the duress acted unlawfully. See *Apfelblat v Nat'l Bank Wyandotte-Taylor*, 158 Mich App 258, 263; 404 NW2d 725 (1987); see also *Hackley v Headley*, 45 Mich 569, 576; 8 NW 511 (1881) (stating that it is not duress for a party to threaten to do what he or she has a lawful right to do). Coercion similarly involves the application of physical or moral force to cause another to do something that the person would not otherwise have done. *Lafeyette Dramatic Prod*, 305 Mich at 216. Coercion, like duress, must involve wrongful conduct: "The coercion, however, must be illegal in nature, manifestly unjust, or purposely oppressive." *Stott Realty Co v Detroit Savings Bank*, 274 Mich 80, 84; 264 NW 297 (1936). A claim of duress or coercion "will not prevail to invalidate a contract entered into with full knowledge of all the facts, with ample time and opportunity for investigation, consideration, consultation, and reflection." *Payne v Cavanaugh*, 292 Mich 305, 308; 290 NW 807 (1940). Rather, the evidence must show that the person affected by the duress or coercion "ceased to be a free moral agent and was thereby incapacitated to consent to the agreement . . . ." *Meier v Schulte*, 327 Mich 206, 212; 41 NW2d 351 (1950).

1. THE AIRPLANE INCIDENT

With regard to Silverman's threats, Spitzer relied heavily on the letters sent by Deuman in which she threatened to file a report with the FAA.

In a letter dated October 24, 2012, Deuman brought several issues to Winnick's attention. She addressed Silverman's Morgan Stanley account, an appraisal for the Mackinac Island property, and a stipulation concerning custody of the parties' remaining minor child. She also asked about some personal property:

> I would like to suggest that your client allow my client to access the home to remove all of her furs, her jewelry, and two paintings; one of a girl and one of a boy that she had custom commissioned. These are personal effects to her and there is no reason why she should not obtain them. If I do not have a positive response on this by November 2[,] I will proceed with placing this matter for decision in front of [the judge].

After asking Winnick to have his client turn over the personal property, Deuman proceeded to ask Winnick to provide her with documentation concerning Spitzer's recent incident with the plane:

> I would like you to provide me all documentation regarding Dr. Spitzer's recent crash of his airplane. I presume that there is an insurance claim being filed, and I demand to see a copy of that as soon as possible. If this is not forthcoming, a report will be made appropriately to the FAA.

In a second letter to Winnick, which was dated November 1, 2012, Deuman expressed her frustration with Spitzer's refusal to cooperate. Deuman threatened to file a report with the FAA about the plane crash unless Spitzer delivered several things to Silverman: the insurance policy on the plane, the report of the accident, Silverman's jewelry, Silverman's furs, and the requested paintings. Although Deuman demanded the jewelry, furs, and paintings, it was evident that her frustration primarily involved Spitzer's refusal to provide information about his recent crash, which—she noted—involved a valuable marital asset. Deuman suggested that Winnick had deliberately mischaracterized or "downplayed" the nature of the accident: "You can call it anything you want but it was not a safe and damage free landing." She wrote that she had learned some preliminary information about the incident and understood that Spitzer had to replace the engines and had not insured the plane. She suggested that he should not be flying it under the circumstances. She also stated her belief that Spitzer was "not acting rationally around" Silverman at the hospital where the parties both worked. Deuman was convinced that the trial court would rule in her client's favor on these issues and wrote that Winnick should make arrangements promptly.

The parties' airplane was a valuable marital asset, which was apparently under Spitzer's sole control. Because it was a marital asset, Silverman had the right to know whether and to what extent it might have been damaged, whether the marital estate had been exposed to any liability, and whether the estate had a viable insurance claim. She also had the right to know if Spitzer was using marital assets to repair the airplane. Accordingly, Deuman cannot be said to have overstepped the bounds of propriety when she asked for information and records about the crash in her letter of October 2012. She also did not directly connect her request to turn over Silverman's jewels, furs, and paintings to the issue with the crash, but instead indicated that she would ask the trial court to decide the issue, which was entirely appropriate. Therefore, this letter did not involve any illegal, manifestly unjust, or purposely oppressive conduct. *Stott Realty Co*, 274 Mich at 84.

In her letter of November 2012, Deuman did threaten to report Spitzer's accident to the FAA unless he turned over the requested documents and personal property,[1] but she presented her demand in the same context—namely, that the airplane was a significant marital asset and her client had the right to any documentation bearing on the condition of that asset and the potential for liability. Her letter was in some respects unprofessional and poorly drafted, but it is apparent that Deuman wrote out of frustration with Winnick's—or Spitzer's—failure to fully disclose the severity of the crash and Spitzer's handling of the marital estate: "This game of 'keep away' cannot and, undoubtedly, will not continue particularly when [the court] gets a good look at what is going on; especially with the flight problems Dr. Spitzer has and that the problem is an ongoing one."

When read in context, this letter too was not particularly threatening and did not amount to illegal, manifestly unjust or purposefully oppressive conduct. See *id.* Indeed, the trial court determined that the parties' various motions concerning the plane crash and the letters did not warrant any sanctions or even extraordinary relief. It is, however, plain that the lawyers involved on both sides had resorted to inappropriate and unprofessional tactics; it was unprofessional for Abramson to accuse Deuman of criminal conduct and it was unprofessional for Deuman to use Spitzer's love of flying as leverage in the divorce. In the end, however, the trial court reasonably handled the disputes: it allowed discovery concerning the crash subject to a protective order, denied Abramson's request for sanctions arising out of Deuman's threatening letters, and allowed Spitzer to continue to use and control the plane, albeit with the requirement that he insure it. Given that the letters were sent months before the parties entered into the settlement agreement and that the trial court resolved all the issues relating to the letters weeks before the settlement, it is difficult to see how these letters exercised such a powerful effect on Spitzer's will that he "ceased to be a free moral agent" and lost the capacity to contract on the day of the settlement. *Meier*, 327 Mich at 212.

The record also supports the trial court's finding that Spitzer understood that his license was not really in danger as a result of Silverman's threat to file an accident report.[2] Prior to the settlement, Spitzer filed documents with the court in which he stated his position that Deuman was using the accident to gain leverage in the divorce and argued that the details concerning the accident were irrelevant to the divorce proceedings. At the hearing on the motion to set aside the agreement, Winnick testified that he vigorously opposed every effort by Deuman to make the accident an issue in the divorce and he opined that the accident issue was going "nowhere" because it was irrelevant. He also explained to the court that Spitzer told him that he did not do anything "wrong" with regard to the incident with the airplane and, for that reason, was not concerned about the threats to file a report—he just wanted to avoid the "annoyance of the

---

[1] In his motion to enter a default, which Abramson signed, Spitzer inaccurately stated that Deuman threatened to accuse him of committing a crime—namely, to report him for violating FAA regulations. In her letters, Deuman did not threaten to accuse Spitzer of committing a crime; she threatened to file crash report with the FAA, which it was her position, she might have an obligation to do.

[2] Spitzer continues to assert on appeal that the incident was not one that had to be reported.

investigation."[3] Winnick admitted that he continued to discuss the incident with Spitzer because he was concerned that his client was not being forthcoming and appeared to overreact to any hint of an investigation; specifically, Winnick was concerned that Spitzer had health issues that might have come out in an investigation and which might put his pilot's license at risk, but Winnick's continued preoccupation with the incident cannot be attributed to Deuman.

The parties' record filings and Deuman's letters do not establish that Deuman—acting on Silverman's behalf—engaged in any illegal, manifestly unjust, or purposely oppressive conduct that forced Spitzer to settle against his will. *Stott Realty Co*, 274 Mich at 84. Although Spitzer testified that he felt that he was under "duress" for months as a result of people telling him he was going to lose his pilot's license and other things, he testified that it was Winnick and his statements concerning the potential problems that might occur if the case proceeded to trial that led him to settle. That is, by Spitzer's own admission, the coercion he felt was primarily caused by his own lawyer, Winnick. To be sure, Deuman's vigorous advocacy helped raise the stress of the litigation, but Spitzer did not allege or argue that he was under such stress that he lost the mental capacity to contract. Rather, he argued that his will was overcome by the threats to his profession and his love of flying and the evidence showed that Deuman did not coerce Spitzer into settling with such threats. Consequently, on this record, we cannot conclude that the trial court clearly erred when it found that Deuman's threats to file a crash report did not influence Spitzer's decision to settle. *Vittiglio*, 297 Mich App at 398. It also did not clearly err when it found that Deuman's actions surrounding the airplane incident played no role in Spitzer's decision to settle. *Id.*

## 2. THE SETTLEMENT

It is well established that duress or coercion cannot be used to set aside an agreement unless the duress or coercion was caused by the opposing party. See *Musial v Yatzik*, 329 Mich 379, 383; 45 NW2d 329 (1951). Consequently, a party cannot set aside an agreement on the ground that his or her lawyer coerced the settlement; there must be evidence that the opposing party actively participated in the coercion.[4] *Howard v Howard*, 134 Mich App 391, 397; 352 NW2d 280 (1984).

In his motion to set aside the settlement agreement, Spitzer presented strong evidence that Winnick engaged in unprofessional conduct. Winnick's communications with Spitzer show that Winnick did not treat Spitzer with dignity and respect—he used profane language and accused his client of reprehensible conduct. It is also evident that Winnick believed that Spitzer had severely undermined his ability to obtain spousal support from Silverman and, for that reason, placed substantial pressure on Spitzer to settle. Furthermore, as Spitzer aptly describes on

---

[3] Winnick testified that he asked Spitzer whether he was worried about any criminal or administrative liability with regard to his incident with the airplane and Spitzer told him, "No."

[4] In such cases, the client has an adequate remedy; the client can sue his or her lawyer for malpractice: if the jury finds for the client, the judgment will compensate the client for the difference between the value of the coerced settlement and a fair division of the marital estate.

appeal, the circumstances surrounding the events on the day of the settlement permit an inference that Winnick took advantage of events to persuade Spitzer that he had to quickly settle the case, even though it might not have been in his best interest to do so at that time. But even assuming that Winnick engaged in wrongful and oppressive conduct that overcame Spitzer's will and forced him to settle, see *Meier*, 327 Mich at 212, there is no evidence that Deuman colluded with Winnick to coerce Spitzer to settle on that basis or otherwise directly participated in Winnick's coercion.

We cannot agree with Spitzer's contention on appeal that Deuman participated in Winnick's coercion by creating an environment that made Winnick's coercion more effective.[5] In order to warrant setting aside a settlement on the grounds of duress or coercion, the opposing party must himself or herself engage in wrongful conduct to coerce settlement. *Musial*, 329 Mich at 383. Spitzer admitted on cross-examination that he did not speak with Deuman or Silverman on the day of the settlement before agreeing to the settlement on the record. Instead, Deuman communicated with her client in a separate room and then conveyed her client's wishes to Winnick, who then spoke with Spitzer in a different room. The only evidence that Deuman took any action to coerce the settlement involved Deuman's letters concerning the airplane incident, which were sent months earlier, and her efforts to conduct discovery with regard to the incident; and we have already determined that the trial court did not clearly err when it found that those letters and Deuman's other actions concerning the airplane incident did not directly affect Spitzer's decision to settle.

Deuman did file a motion with the trial court that suggested she had become aware that Spitzer had access to funds other than marital funds because he used such funds to pay for the repairs to the airplane, but there is no evidence that she knew about the specific acts that Spitzer took to obtain the funds or thought that the transfers were improper. There is also no evidence that Deuman tried to use Spitzer's handling of the funds to coerce a settlement. Although Deuman likely contributed to Spitzer's strain by zealously advocating for her client and manipulating every advantage that she could discern, Deuman's acts did not rise to the level of illegal, manifestly unjust, or purposely oppressive conduct done to coerce Spitzer into settling. *Stott Realty Co*, 274 Mich at 84. Because there is no evidence that Silverman—through Deuman—participated in Winnick's coercive conduct, even if Winnick wrongfully coerced Spitzer to settle, that coercion would not warrant setting aside the settlement agreement. *Howard*, 134 Mich App at 397. Therefore, we need not determine whether the trial court clearly erred when it found that Winnick's threats and actions did not coerce Spitzer into settling. Even if the trial court had clearly erred in that regard, that error would not warrant relief because neither Deuman nor Silverman participated in Winnick's coercion. See MCR 2.613(A). The trial court did not abuse its discretion when it denied Spitzer's motion to set aside the settlement agreement. *Tinkle*, 106 Mich App at 426.

---

[5] On appeal, Spitzer argues that Winnick "picked up on Attorney Deuman's theme of wrongdoing" and Winnick's threats "were informed by [Deuman's] treatment of the FAA reporting issue."

## 3. ERRORS OF LAW AND EVIDENCE

We also do not agree with Spitzer's contention on appeal that the trial court's findings and conclusions of law demonstrated that it "did not understand the law of coercion." Spitzer maintains that the trial court apparently did not understand that he was compelled to answer in the affirmative when Winnick examined him on the day of the settlement. But we do not read the trial court's statements concerning Spitzer's testimony at the settlement as an indication that it did not understand that Winnick might have coerced Spitzer's answers. The trial court presided over the settlement and had the opportunity to assess Spitzer's demeanor and, on the whole record, the trial court could reasonably find that Spitzer's testimony on that day was knowingly and voluntarily made. MCR 2.613(C). Thus, the trial court's reliance on that testimony does not demonstrate that the trial court was laboring under a misunderstanding of the applicable law. The fact that the trial court held an evidentiary hearing that spanned several days and took testimony from various witnesses—including Spitzer and Winnick—concerning the events leading to the settlement demonstrates that the trial court was not laboring under the mistaken belief that it had to accept Spitzer's testimony from the day of the settlement.

Similarly, the trial court did not abuse its discretion when it limited the testimony and evidence to the events surrounding Spitzer's decision to settle on the day at issue. In her letters, Deuman did not threaten to file a report with the FAA unless Spitzer settled the division of the marital estate and gave up his claim for spousal support; Deuman threatened to file a report with the FAA if Spitzer did not turn over documentation on the incident and failed to return certain personal property. That is, to the extent that Deuman's letters could be said to involve improper coercion, they were directed at coercing discovery and the transfer of personal property. Thus, any testimony and evidence concerning the events involving those letters was not particularly relevant to the coercion operating on Spitzer on the day of the settlement. MRE 401; MRE 402. Moreover, as the trial court repeatedly emphasized at the evidentiary hearing, the parties had litigated the issues surrounding Deuman's letters and the incident with the airplane "ad nauseam." The court was well aware of the role that the plane incident and letters played to that point. Accordingly, the trial court's decision to limit the testimony and evidence—even if otherwise minimally relevant—to the facts concerning Spitzer's state of mind on the day of the settlement did not fall outside the range of reasonable outcomes. See MRE 403; *Barnett*, 478 Mich at 158-159.

## C. CONCLUSION

The trial court did not clearly err when it found that Deuman's letters and actions concerning the incident with the airplane did not coerce Spitzer into settling the division of the marital estate in February 2013. And, even if the trial court clearly erred when it found that Winnick's actions on the day of the settlement did not overcome Spitzer's will and compel him to settle, an issue that we decline to address, that error would not warrant relief. Other than Deuman's letters and attempts to discover evidence concerning the airplane accident, which the trial court found did not play a role in Spitzer's decision, there was no evidence that Silverman—through her lawyer—participated in Winnick's coercion. Therefore, Spitzer failed to establish grounds for setting the settlement aside.

The trial court did not abuse its discretion when it denied Spitzer's motion to set aside the settlement agreement on the grounds that the settlement was coerced.

## III. UNCONSCIONABLE SETTLEMENT

### A. STANDARDS OF REVIEW

On appeal, Spitzer argues the trial court also erred when it did not set aside the agreement as unconscionable. Specifically, he maintains that the evidence that he acted under duress or coercion also demonstrates that he entered into the agreement under conditions of procedural unconscionability. He further argues that, had the trial court not improperly prevented him from conducting discovery, he could have established that the settlement was substantively unconscionable. This Court reviews a trial court's decision on a motion to set aside a settlement agreement for an abuse of discretion. *Tinkle*, 106 Mich App at 426. This Court reviews a trial court's decision to limit evidence for an abuse of discretion. *Barnett*, 478 Mich at 158-159.

### B. ANALSYIS

In order to set aside a settlement agreement as unconscionable, the moving party must establish both procedural and substantive unconscionability. *Vittiglio*, 297 Mich App at 403.

> Procedural unconscionability exists where the weaker party had no realistic alternative to acceptance of the term. *Allen v Michigan Bell Tel Co*, 18 Mich App 632, 637; 171 NW2d 689 (1969). If, under a fair appraisal of the circumstances, the weaker party was free to accept or reject the term, there was no procedural unconscionability. *Id.* Substantive unconscionability exists where the challenged term is not substantively reasonable. *Id.* at 637-638. However, a contract or contract provision is not invariably substantively unconscionable simply because it is foolish for one party and very advantageous to the other. *Gillam v Michigan Mortgage-Investment Corp*, 224 Mich 405, 409; 194 N.W. 981 (1923). Instead, a term is substantively unreasonable where the inequity of the term is so extreme as to shock the conscience. *Id.* [*Clark v DaimlerChrysler Corp*, 268 Mich App 138, 144; 706 NW2d 471 (2005).]

As the trial court correctly noted at the hearing to set aside the settlement agreement, whether an agreement is substantively unconscionable must be determined from the facts as they existed at the time of the agreement. See *Northwest Acceptance Corp v Almont Gravel, Inc*, 162 Mich App 294, 300; 412 NW2d 719 (1987). Because Spitzer and Silverman proceeded to divide the marital estate on the basis of their understandings of the values after incomplete discovery on the day of the settlement, the trial court determined that Spitzer could not testify concerning his current understanding of the values because that evidence was not relevant to whether the agreement was unconscionable at the time of the agreement. The court explained that it would be unfair to allow Spitzer to claim unconscionability on the basis of valuations that neither party had available at the time of the settlement: "I can't go back and fix that. I mean I can't go back and manufacture discovery now. They knew that it wasn't completed. Everybody knew here. Now to affix numbers to those things now. I mean then why—that's the problem with this case." Under these circumstances, the trial court did not abuse its discretion when it prevented Spitzer

-12-

from presenting evidence that the values were different than understood by the parties at the time of the settlement. *Barnett*, 478 Mich at 158-159.

Although the parties had not completed discovery, the record evidence up to the time of the settlement demonstrated that the parties had a basic understanding of the marital assets at issue and their debts. At the hearing on the settlement agreement, Spitzer stated he wanted to obtain the home and lot on Mackinac Island, the home in which he resided in Sault St. Marie, and the home in West Bloomfield. In the settlement, he received each of these properties. He also wanted to receive all the membership interests in the company that owned the parties' airplane, which he also received. Despite receiving each of the assets that he specifically wanted, Spitzer still argued that the division of the estate was so inequitable as to shock the conscience. He alleged that the total value of the assets he received—after adjusting for secured debts—amounted to just $1.645 million, whereas Silverman received approximately $2.4 million of the marital estate.[6]

On this record, we cannot conclude that the trial court erred when it determined that the division of the martial estate was not unconscionable. In order to obtain specific assets with sentimental or personal value, a reasonable person might be willing to settle for a smaller overall percentage of the estate. See *Northwest Acceptance Corp*, 162 Mich App at 302 (noting that an unconscionable bargain is often characterized as one that no man in his senses and not under a delusion would make). And, although there appeared to be a substantial difference in the value of the assets awarded to each party, even assuming that Spitzer's valuations were accurate, the difference is not so extreme that it shocks the conscience. *Clark*, 268 Mich App at 144.

The fact that the parties waived the right to spousal support in their agreement also does not shock the conscience. The parties to a divorce may waive their statutory right to receive spousal support. *Staple v Staple*, 241 Mich App 562, 568-569; 616 NW2d 219 (2000). Spitzer had earlier asserted his right to spousal support; he moved for entry of an order compelling his wife to pay him spousal support on the grounds that she earned substantially more income (he alleged that she earned $650,000 per year and that he only earned $250,000 per year). But Silverman contested Spitzer's claim. In her response, Silverman denied that she earned $650,000 per year and took the position that Spitzer had been keeping his income artificially low by "refus[ing] to seriously work at his practice." Consequently, at the time of the settlement, the parties understood that there was a significant dispute concerning their actual incomes, their earning potential, and the propriety of an order for spousal support.

At the hearing on the motion to set aside the settlement, Spitzer asserted that the settlement was unsatisfactory because, without an order for spousal support to equalize their incomes, it left him in an untenable position. Specifically, he complained that his income was insufficient to allow him to keep the home on Mackinac Island and to continue to enjoy his airplane: "And so I had to service two mortgages on a substantially lower portion of the income—of the total family income. And so the other main component, to not go bankrupt, was

---

[6] As alleged in his motion, the disparity primarily arose from the difference in the values between the parties' pensions.

to allow me to continue to fly the airplane and not lose the house on Mackinac Island." Spitzer's lawyer similarly asserted at the hearing that the settlement made no sense considering the parties' cash flow. However, the fact that Spitzer regrets waiving his spousal support does not render the agreement unconscionable. Although Spitzer always maintained the position that Silverman made substantially more than he did and that he would require spousal support in order to continue to maintain the lifestyle to which he had become accustomed, it is not clear that he could have established the factual basis for his position had he proceeded to trial rather than settle. A trial might have revealed that Silverman made substantially less and that Spitzer made or could have made substantially more. Accordingly, Spitzer might not have been able to establish grounds for spousal support or might have received substantially less support than he initially requested. Under these circumstances, a reasonable person in Spitzer's position might conclude that it was better to waive spousal support in order to settle the dispute and obtain the martial estate's most desirable assets without the hassle and uncertainty of further litigation. See *Northwest Acceptance Corp*, 162 Mich App at 302.

The trial court did not err when it determined that the settlement was not on its face substantively unconscionable. Consequently, it did not err when it denied Spitzer's motion to set aside the settlement agreement on that basis.[7]

## IV. SANCTIONS

## A. STANDARD OF REVIEW

On cross-appeal, Silverman argues that the trial court erred when it refused to order Spitzer and his lawyers to pay sanctions for filing a frivolous motion to set aside the settlement agreement. This Court reviews a trial court's finding that a motion was not frivolous for clear error. *Kitchen v Kitchen*, 465 Mich 654, 661, 641 NW2d 245 (2002).

## B. ANALYSIS

A trial court must order a party or lawyer who files a motion in violation of MCR 2.114(D) to pay an appropriate sanction. MCR 2.114(E); see also MCL 600.2591. A party violates that rule if he or she signs the motion, in relevant part, without ensuring through a reasonable inquiry that the motion is well grounded in fact and is warranted by existing law. MCR 2.114(D).

Spitzer moved to set aside the settlement on the basis of duress or coercion and on the ground that the agreement was unconscionable. In support of his motion, Spitzer cited Deuman's threatening letters and his communications with Winnick preceding the settlement. In the communications, Winnick treated Spitzer in an undignified manner and suggested that Spitzer should settle to avoid litigation that might jeopardize Spitzer's medical license. The

---

[7] Because Spitzer failed to establish that the settlement was substantively unconscionable, we need not address whether the settlement involved procedural unconscionablility. *Clark*, 268 Mich App at 144.

documentary evidence was minimally sufficient to establish a factual basis for a hearing on the claim under existing law. Moreover, although the settlement agreement was not on its face unconscionable, given the parties' respective positions in the litigation prior to the settlement, Spitzer's claim that the agreement might be unconscionable considering the circumstances surrounding the settlement was reasonably grounded on fact and law.

The trial court did not err when refused to order sanctions under MCR 2.114(E).

## V. GENERAL CONCLUSION

There were no errors warranting relief.

Affirmed. Neither party having prevailed in full, we order that neither may tax costs. MCR 7.219(A).


/s/ Michael J. Kelly
/s/ Mark J. Cavanagh
/s/ Patrick M. Meter